IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

RAMON A. JOYNER,                )
                               )
          Plaintiff,            )
                               )
     v.                         )     Civ. No. 23-953-CFC
                               )
OFFICER HAMMOND, *et al.*,       )
                               )
          Defendants.           )

Ramon A. Joyner, Smyrna, Delaware – *Pro se* Plaintiff

Lorin Huerta, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware –
Counsel for Defendants Officer Hammond, Officer Luke, Robert May, Lieutenant
Faulkner, Captain Sennett, and Major Dotson

**<u>MEMORANDUM OPINION</u>**

August 19, 2025
Wilmington, Delaware

CONNOLLY, Chief Judge:

Plaintiff Ramon A. Joyner, a current inmate at James T. Vaughn Correctional Center (JTVCC), filed this lawsuit in August 2023 pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights. (D.I. 2.) He appears *pro se* and was granted permission to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. (D.I. 11.) On April 2, 2024, Plaintiff amended the complaint, adding three new defendants. (D.I. 16.) In the Amended Complaint, Plaintiff alleges that six Delaware Department of Corrections (DDOC) employees[1] violated his Eighth Amendment rights by failing to protect him from another inmate's assault on April 12, 2023. (*See* D.I. 16 at 2–4.) After discovery concluded, Defendants filed a motion for summary judgment. (D.I. 40.) Upon review and consideration, this Court will grant Defendants' motion.

## I.    BACKGROUND

On April 12, 2023, Defendants Hammond and Luke escorted Plaintiff and another inmate, Antoine Banks, to the recreation yard. (*See* D.I. 16 at 2; D.I. 41-3 ¶ 13.) Per DDOC safety policy, Hammond and Luke locked Plaintiff and Banks in the recreation yard and began uncuffing them one at a time, starting with Banks.

---

[1] The Amended Complaint names Officer Hammond, Officer Luke, Robert May, Lieutenant Faulkner, Captain Sennett, and Major Dotson as defendants. (D.I. 16 at 6–8.)

1

(D.I. 16 at 2; D.I. 41-3 ¶¶ 15–16.)  Once Banks was uncuffed, Banks began "punching [Plaintiff] in the face." (D.I. 16 at 2; *see also* D.I. 41-3 ¶ 17.)

Plaintiff and Defendants offer different versions of what happened next. According to Defendants, Hammond and Luke immediately commanded Banks to stop, (D.I. 41-3 ¶ 18), and within the first ten seconds of the attack, Hammond pepper-sprayed Banks (D.I. 41-3 ¶ 19).  Within thirty seconds, enough officers had arrived to safely open the recreation cage.  (D.I. 41-3 ¶ 20.)  And within forty-five seconds, the officers pulled Plaintiff out of the recreation cage.  (D.I. 41-3 ¶ 21.)

According to the Amended Complaint, however, Defendants froze when the assault began, refused to uncuff Plaintiff, and then sprayed Plaintiff in the face with pepper spray.  (*See* D.I. 16 at 2.)  Plaintiff asserts that "Banks was never touched by the [pepper spray]" but admits that the pepper spray prompted Banks to back away from Plaintiff.  (D.I. 16 at 2.)  Plaintiff alleges that the incident has resulted in both physical injury and emotional distress.  (D.I. 16 at 3.)  Plaintiff alleges that he has suffered "a torn retina in [his] left eye that had to be fixed by laser treatment," causing him to "suffer from floaters in [his] eye for the rest of [his] life."  (D.I. 16 at 3.)  Plaintiff also alleges that the incident caused him emotional distress by "further messing with [his] mental health" and creating "P.T.S.D. when handcuffed around other inmates."  (D.I. 16 at 3.)

Plaintiff says that Defendants were aware that Plaintiff was in danger prior to the assault for several reasons. First, Plaintiff alleges that in early 2023, Defendants Faulkner and Dotson moved him out of protective custody "to a regular tier in the Security Housing Unit, which is known to have a high concentration of [B]lood gang members." (D.I. 16 at 2.) Plaintiff alleges that, starting in 2022, he had been "placed in protective custody [due] to continuous threats of violence and acts of [actual] violence by [B]lood gang members." (D.I. 16 at 1.) According to Plaintiff, Defendants May and Faulkner were therefore "aware of [Plaintiff's] situation." (D.I. 16 at 1.) When Faulkner and Dotson moved Plaintiff out of protective custody, "[Plaintiff] was put next to a Blood gang member"—"one of the institution['s] problem inmates" with known "violent tendencies." (D.I. 16 at 2.) Second, Plaintiff alleges that, on the day of the incident, he "repeatedly let staff and administration know that [he did not] feel comfortable." (D.I. 16 at 2.)

Defendants dispute Plaintiff's allegations. According to Defendants, Plaintiff was never in, and had never requested to be in, protective custody. (D.I. 41-2 ¶¶ 6–7; D.I. 41-3 ¶¶ 5–6; D.I. 41-4 ¶¶ 7–8.) Rather, Sennett transferred Plaintiff to the Special Management Unit after a fight with another inmate on November 6, 2022. (*See* D.I. 41-2 ¶ 8; D.I. 41-3 ¶ 7; D.I. 41-4 ¶ 9.) The Special Management Unit is in the Security Housing Unit, and it houses two types of inmates—inmates

in protective custody and inmates being reclassified due to disciplinary actions. (D.I. 41-2 ¶ 9; D.I. 41-3 ¶ 8; D.I. 41-4 ¶ 10.)  On December 16, 2022, Plaintiff was transferred to maximum security housing (D.I. 41-2 ¶ 10; D.I. 41-3 ¶ 9; D.I. 41-4 ¶ 10) where he became recreation yard partners with Banks (D.I. 41-3 ¶ 11). Plaintiff and Banks remained recreation yard partners until April 12, 2023, the day that Banks assaulted Plaintiff.  (D.I. 41-3 ¶ 11.)  Defendants also dispute that Plaintiff told the staff about his discomfort.  Dotson, Hammond, and Sennett each state that Plaintiff "never informed me he was fearful of . . . Banks." (D.I. 41-2 ¶ 12; D.I. 41-3 ¶ 12; D.I. 41-4 ¶ 11.) Dotson and Hammond also state that Plaintiff "never informed [them] of a fear of substantial harm." (D.I. 41-2 ¶ 11; D.I. 41-3 ¶ 10.)

According to Plaintiff, after the incident, Sennett apologized to Plaintiff "about the whole situation."  (D.I. 16 at 4.)  Plaintiff also alleges that "the administration has installed another opening on all cages as of the filing of this lawsuit." (D.I. 16 at 2.)  Plaintiff asserts that this change in facility protocol further "shows [Defendants] are at fault." (D.I. 16 at 2.)

## II.    LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of

demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Where the burden of persuasion at trial would be on the non-moving party, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the non-moving party's case, after which the burden of production shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita*, 475 U.S. at 586–87; *Williams v. West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely

disputed must support such an assertion by "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460-61.

The court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true . . . ." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). If "there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Id.* at 1081 (internal quotation marks omitted). But the Supreme Court has provided that:

> Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." The mere existence of some alleged factual dispute between the parties will not defeat

6

> an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (citations, quotations, and alterations omitted).

## III. DISCUSSION

The Eighth Amendment provides an inmate with "a clearly established constitutional right to have prison officials protect him from inmate violence," *Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012), *abrogated on other grounds by Fisher v. Hollingsworth*, 115 F.4th 197, 204 (3d Cir. 2024). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment failure to protect claim, a plaintiff must show that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) a prison official acted with deliberate indifference to an inmate's health or safety. *Id.* Showing deliberate indifference requires that "defendants actually knew or were aware of the significant risk of harm to the plaintiff[]." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125

(3d Cir. 2001); *see also Farmer*, 511 U.S. at 837 ("[T]he official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). An official "must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers-Capitol*, 256 F.3d at 133. But an official's subjective knowledge can be established by circumstantial evidence showing that "the excessive risk was so obvious that the official must have known of the risk." *Id.*

In the Amended Complaint, Plaintiff identifies two bases for his Eighth Amendment failure-to-protect claim. First, Plaintiff alleges that by freezing up, standing by, and refusing to take Plaintiff's handcuffs off, Defendants Hammond and Luke failed to intervene and protect Plaintiff from Banks's assault, thereby violating Plaintiff's rights. (*See* D.I. 16 at 2–4.) Second, Plaintiff alleges that by removing him from protective custody, Defendants Faulkner, Dotson, Sennett, and May violated Plaintiff's Eighth Amendment rights. (D.I. 16 at 3–4.) Having reviewed the record, this Court does not find evidence from which a trier of fact could reasonably infer that Plaintiff was incarcerated under conditions posing a substantial risk of serious harm or that Defendants knew of or disregarded a significant risk of harm to Plaintiff.

8

There is no record evidence showing that housing Plaintiff outside of protective custody, pairing him with Banks as recreational yard partners, or uncuffing Banks before uncuffing Plaintiff in the recreational yard posed a significant risk of harm to Plaintiff. Contrary to Plaintiff's allegations, nothing in the record suggests that Plaintiff was ever housed in protective custody. (D.I. 41-2 ¶ 6; D.I. 41-3 ¶ 5; D.I. 41-4 ¶ 7.)  Nor did Plaintiff ever request to be placed in protective custody. (D.I. 41-2 ¶ 7; D.I. 41-3 ¶ 6; D.I. 41-4 ¶ 8.)  Plaintiff has not offered any evidence to support his allegation that Banks was "a Blood gang member and one of the institution[']s problem inmates." (D.I. 16 at 2.)  There is nothing in the record to suggest that having Banks as a recreational yard partner created a substantial risk of serious harm. Plaintiff also alleges that "[f]or years inmates and staff have complained about changing the way they do recreation and allowing inmates to be uncuffe[d] by staff one by one" and that "there have been over 20 of these incidents." (D.I. 16 at 4.) But Plaintiff has not offered any evidence to support these allegations or to show, more generally, how this practice of uncuffing inmates in the recreation yard poses a substantial risk of serious harm.

Even if a substantial risk of serious harm existed, there is also no record evidence that any Defendant knew of and disregarded such a risk to Plaintiff's safety. The record does not contain evidence showing that Defendants knew or were aware

of any risk stemming from Plaintiff being housed outside of protective custody.  In his deposition, Plaintiff addressed only the alleged knowledge of Defendants Hammond, Luke, and May.  (*See* D.I. 41-1 at 35:3–5, 35:22–24, 56:12–18, 57:14–21.)  With respect to Hammond, Plaintiff stated that he told Hammond "every day that [he] didn't understand why [he] was over there in general population." (D.I. 41-1 at 35:3–5.)  He also stated that, on the day of the incident, he told Hammond, "I don't feel comfortable being over here.  Why am I not on [protective custody]?" (D.I. 41-1 at 35:22–24.)  But Plaintiff admitted that he did not say anything to Hammond about his fellow inmate, Banks.  (D.I. 41-1 at 35:25–36:2.)  And the record is devoid of any evidence that Plaintiff expressed to Defendants fear of substantial harm or of Banks.  (D.I. 41-2 ¶¶ 11–12; D.I. 41-3 ¶¶ 10, 12; D.I. 41-4 ¶ 11.)  With respect to Luke's knowledge of "tensions . . . between [Plaintiff] and Inmate Banks," Plaintiff stated only that he "would guess" and that Luke "should be aware" because "[Hammond and Luke] work together."  (D.I. 41-1 at 56:12–18.) But such evidence fails to establish Luke's knowledge or awareness of a substantial risk of serious harm because "it is not sufficient that the official should have been aware."  *Beers-Capitol*, 256 F.3d at 133.  Plaintiff's deposition testimony that "the warden [May] has to be aware of everything[] that's going on on that tier" fails for the same reason.  (D.I. 41-1 at 57:14–21.)  The record also lacks any evidence

10

showing that Defendants knew of and disregarded a substantial risk of serious harm resulting from the DDOC's practice of uncuffing one inmate at a time in the recreation yard. Plaintiff alleges that this practice has resulted in "over 20 of these incidents," D.I. 16 at 4, but he has failed to offer any evidence in support.

With respect to the April 12, 2023 incident, there is also no record evidence that shows Defendants knew of and disregarded a substantial risk of serious harm to Plaintiff in the recreation yard. Nothing in the record shows that Plaintiff told Defendants that he feared Banks. (*See* D.I. 41-1 at 35:20–36:10, 37:24–38:16; D.I. 41-2 ¶ 12; D.I. 41-3 ¶ 12; D.I. 41-4 ¶ 11.) During his deposition, Plaintiff admitted that he never saw Banks "do anything that would have made him end up in the [Security Housing Unit]." (D.I. 41-1 at 34:5–9; *see also* D.I. 41-1 at 1–21.) And the record shows that Plaintiff and Banks were recreation yard partners from December 16, 2022 until April 12, 2023 without any mention of prior incidents or threats. (*See* D.I. 41-3 ¶ 11.)

Even if Defendants did know of a substantial risk of serious harm to Plaintiff, record evidence shows that Defendants acted reasonably in response to Banks's assault of Plaintiff. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

11

Here, after Banks began punching Plaintiff, Hammond and Luke "immediately attempted to halt the attack using verbal commands." (D.I. 41-3 ¶ 18.) Within ten seconds of the attack, Hammond "fired pepper spray at Inmate Banks." (D.I. 41-3 ¶ 19.) After thirty seconds passed, "enough officers were present to safely open the recreation cage." (D.I. 41-3 ¶ 20.) And within forty-five seconds, the officers pulled Plaintiff out of the recreation cage. (D.I. 41-3 ¶ 21.) Plaintiff has not offered any evidence to support his alternative version of events as alleged in the Amended Complaint. (*See* D.I. 16 at 2.)

Viewing the evidence in the light most favorable to Plaintiff, the record suggests, at most, the possibility that Defendants may have acted negligently, and an allegation sounding in negligence does not give rise to § 1983 liability. *See Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). As such, the record does not suggest deliberate indifference by any Defendant. Because there is no genuine dispute as to any material fact, Defendants are entitled to judgment as a matter of law.

Furthermore, the record does not reflect sufficient involvement of Defendants May, Faulkner, Sennett, or Dotson to establish liability for a § 1983 claim. A "defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable." *Sutton v. Rasheed*, 323 F.3d 236, 249 (3d Cir. 2003),

*as amended* (May 29, 2003) (internal quotation mark omitted). "Section 1983 will not support a claim based on a *respondeat superior* theory of liability." *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981).

In light of the foregoing, this Court will grant Defendants' motion for summary judgment. (D.I. 40.) Judgment will be entered in Defendants' favor, and this case will be closed.

## IV.    CONCLUSION

For the above reasons, the Court will grant Defendants' motion for summary judgment. (D.I. 40.)

An appropriate Order will be entered.

13